IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAINT-GOBAIN PERFORMANCE PLASTICS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Case No. 2:26-cv-02590 |
| v. | ) ) | JURY TRIAL DEMANDED |
| NEWAGE INDUSTRIES INC. d/b/a ADVANTAPURE | ) ) ) | |
| Defendant. | ) ) ) | |

## COMPLAINT

Plaintiff Saint-Gobain Performance Plastics Corporation ("Saint-Gobain" or "Plaintiff") brings this action against Defendant NewAge Industries Inc. d/b/a AdvantaPure ("NewAge Industries"), alleging as follows:

## INTRODUCTION

1. Saint-Gobain brings this action to stop a competitor's unlawful use of its crown jewels—highly sensitive technical, commercial, and customer information—stolen by a trusted insider on her way out the door to work for Saint-Gobain's competitor, NewAge Industries.

2. Forensic review shows that, while interviewing with NewAge Industries, and in the days surrounding her resignation from Saint-Gobain, Suzanne MacManus violated her contractual obligations to Saint-Gobain and mass-downloaded and exported over one hundred Saint-Gobain trade secret files, including design drawings, pricing and cost data, quotes, purchase orders, and detailed customer and contact lists. Ms. MacManus then transferred them to an external USB drive.

3.      Many of these files did not directly relate to her work at Saint-Gobain, or her anticipated work at NewAge Industries, but rather related to the work of other former Saint-Gobain employees, who are now employees at NewAge Industries.

4.      When Ms. MacManus joined NewAge Industries, she brought these stolen files with her.    With the help of a NewAge Industries Information Technology employee, Ms. MacManus copied approximately 133 Saint-Gobain files from the external USB drive onto her NewAge Industries Laptop, where she proceeded to open them repeatedly and, upon information and belief, shared them with others at NewAge Industries.  After receiving permission from a NewAge Industries employee that knew or should have known that Ms. MacManus had stolen trade secret information from Saint-Gobain, Ms. MacManus sent an email from her personal email account to her NewAge Industries email account attaching trade secret Saint-Gobain customer contact information.

5.      NewAge Industries has admitted that Saint-Gobain documents containing Saint-Gobain trade secret information reside on its systems and on MacManus's NewAge Industries Laptop.  Yet, on information and belief, NewAge Industries failed to stop or remediate the misuse.

6.      The stolen information—spanning technical product data, design specifications, pricing methodologies, and curated customer intelligence—confers an immediate, unfair competitive advantage and threatens irreparable harm to Saint-Gobain's market position and customer relationships if NewAge Industries' misappropriation is not stopped.

7.      Saint-Gobain should further receive just compensation for NewAge Industries' willful and malicious theft.

2

**THE PARTIES**

8.      Plaintiff Saint-Gobain is a Delaware corporation. Saint-Gobain's principal place of business is located at 20 Moores Road, Malvern, Pennsylvania 19355.

9.      Upon information and belief, Defendant NewAge Industries is a Pennsylvania corporation with its principal place of business and registered office located at 145 James Way, Southampton, Pennsylvania 18966.

**JURISDICTION AND VENUE**

10.      This action arises under the laws of the United States, specifically the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*  This Court has original, federal question jurisdiction over the subject matter of this action under the DTSA, 18 U.S.C. § 1836(b)–(c), and 28 U.S.C. § 1331.

11.      This Court maintains supplemental jurisdiction over Saint-Gobain's claim under the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. C.S. § 5301 *et seq.*, pursuant to 28 U.S.C. § 1367, as these state and federal claims are so intrinsically related that they together form part of the same case or controversy.

12.      The Court has personal jurisdiction over NewAge Industries, which was formed in Pennsylvania, is headquartered in Pennsylvania, and regularly conducts business in Pennsylvania, at least by offering for sale and selling products and services in Pennsylvania.

13.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c).  NewAge Industries is incorporated under the laws of Pennsylvania and resides in this District for purposes of venue under 28 U.S.C. §§ 1391(b) and (c).  Events giving rise to the claims in this Complaint occurred in this District.  NewAge Industries conducts business in this District.  NewAge Industries is making use of misappropriated information that was unlawfully taken in this District. The misappropriation has occurred and continues to occur in this District.

14.    Saint-Gobain's products and services are offered and sold throughout the country through channels of interstate commerce.

15.    Likewise, the products and services developed by NewAge Industries are offered and sold throughout the country through channels of interstate commerce.

<b><u>FACTUAL ALLEGATIONS</u></b>

**A. Saint-Gobain Background**

16.    With over three and a half centuries of experience and expertise, including over a century in North America, Saint-Gobain is the worldwide leader in producing high performance polymer products for nearly every industry around the globe, including automotive, medical, pharmaceutical, chemical, healthcare, food, beverage, airline, construction, space, semiconductor and microelectronics.

17.    Saint-Gobain has been actively developing its expertise in polymer products since at least 1990, when it acquired Norton Performance Plastics and Furon.

18.    Saint-Gobain has spent decades and billions of dollars to establish and maintain its position as a market leader in fluid management solutions and components, including through its product research and development, acquisitions, sales and marketing strategies, and pricing strategies.

19.    The fluid-handling hose and tubing industry is highly competitive, with multiple competitors vying for the business of the same customers.  It is imperative for a company in this industry to safeguard its confidential information and trade secrets, such as design drawings, technical product information, customer lists, and pricing information.

20.    NewAge Industries is one of Saint-Gobain's competitors in the fluid-handling hose and tubing market. For example, Saint-Gobain's C-Flex product line competes with NewAge Industries' AdvantaPure product line, including its AdvantaFlex products.

**B. Protection of Saint-Gobain's Trade Secrets**

21.    Saint-Gobain has numerous policies and procedures in place to protect Saint-Gobain's confidential information, including its trade secrets.  These efforts constitute reasonable measures that Saint-Gobain takes to protect its trade secrets.

22.    Saint-Gobain requires all employees to sign an Employment Agreement, which obligates employees to protect Saint-Gobain confidential information and trade secret information.

23.    By signing the Employment Agreement, employees acknowledge that they must use their best efforts and diligence both during and after their employment to protect the confidential, trade secret, and/or proprietary nature of all Saint-Gobain confidential information. They also acknowledge that they must not directly or indirectly use (for themselves or another) or disclose any confidential information for so long as it shall remain proprietary or protectable as confidential or trade secret information.  Employees further acknowledge that upon leaving Saint-Gobain, or at its request, they will promptly deliver to it any and all documents and other material in their possession or control relating directly or indirectly to confidential information.

24.    Saint-Gobain publishes and maintains on its intranet site several internal policies regarding confidentiality, including an Intellectual Property Handbook on protecting innovation and "BOOST" Intellectual Property University Training programs that contain several modules directed to intellectual property matters such as "Protecting Confidential Information."

25.    Saint-Gobain provides regular training sessions on non-disclosure agreements, confidentiality, and protecting trade secret information.  New Saint-Gobain employees receive in-

person training on intellectual property, including protection of confidential, proprietary, and trade secret information.

26.    Saint-Gobain employees are also required to complete biennial mandatory cyber training, which contains various modules concerning data protection, in addition to trainings regarding trade secrets and non-compete agreements.

27.    Saint-Gobain also has a number of physical and technical procedures in place to protect its confidential, proprietary, and trade secret information.  For example, use of certain file sharing applications is prohibited and automatically blocked by Saint-Gobain.

28.    Saint-Gobain's systems are protected by numerous security measures, and users must have a Saint-Gobain username, password, and security code to gain access to log into Saint-Gobain's electronic systems.

29.    Saint-Gobain's electronic systems are protected by state-of-the-art anti-hacker software.  Saint-Gobain has an entire team devoted to continuously monitoring its systems and ensuring Saint-Gobain's information is protected.

30.    Not all Saint-Gobain employees have access to all Saint-Gobain trade secret information.  Only those employees who have a business need to access trade secret information are given access to the trade secrets on Saint-Gobain's electronic systems.

31.    Saint-Gobain has the ability to track, monitor, and audit which user accounts viewed and downloaded documents, and which Saint-Gobain documents were accessed, on its electronic systems, including Salesforce.

32.    When employees leave Saint-Gobain, Saint-Gobain terminates their access to Saint-Gobain electronic systems and requests the return of all Saint-Gobain materials.

6

33.     When employees leave Saint-Gobain, Saint-Gobain has the ability to review that employee's activities on the system prior to departure to confirm that no information was improperly taken.

34.     In the extremely rare instances where Saint-Gobain has identified unusual activity, Saint-Gobain takes immediate action to investigate and prevent any business harm.

35.     The aforementioned policies and procedures are representative of Saint-Gobain's reasonable efforts to protect its trade secrets, but this list is far from exhaustive.

## C. After Many Years Working For Saint-Gobain, Ms. MacManus Steals Its Trade Secrets

36.     Ms. MacManus first joined Saint-Gobain as an employee in October 2005.

37.     In May 2022, Ms. MacManus began working as a Business Development Manager for the Life Sciences, Bioprocess Solutions business for Saint-Gobain.

38.     In her new position at Saint-Gobain, Ms. MacManus had access to and received certain Saint-Gobain confidential and trade secret information, including technical, manufacturing, marketing, financial, and other business information such as customer information, pricing, commercial plans, sales forecasts, new product considerations, design elements, and business strategies.

39.     On May 17, 2022, Ms. MacManus entered into Saint-Gobain's "Employee Confidentiality Agreement" (referred to herein as the "Employment Agreement").

40.     The Employment Agreement includes the following terms:

> "Confidential Information" shall mean all technical and business information directly or indirectly related to the Company [Saint-Gobain] . . . which is of a confidential, trade secret and/or proprietary nature or not generally known to third persons who could derive economic value from its use or disclosure and which is either developed by me or to which I have had access during my employment.

7

I shall use my best efforts and diligence both during and after my Company employment to protect the confidential, trade secret, and/or proprietary nature of all Confidential Information. I shall not directly or indirectly use (for myself or another) or disclose any Confidential Information for so long as it shall remain proprietary or protectable as confidential or trade secret information, except as may be necessary for the performance of my Company duties.

Upon leaving the employ of the Company, or at the Company's request, I will promptly deliver to it any and all documents and other material in my possession or control relating directly or indirectly to Confidential Information.

Any work product . . . shall be and remain the sole and exclusive property of the Company. . . .

I agree that all of my obligations set forth in the preceding paragraphs of this Agreement shall continue beyond termination for any reason of my employment with the Company, and that such obligations shall be binding on my heirs and assigns. . . .

I agree to devote my skill and best effort during the period of my employment with the Company to such duties as may be assigned to me, to diligently work exclusively to further the best interests of the Company during the period of my employment, and to comply with the policies and procedures of the Company. I further agree that I shall not work for, or directly or indirectly in any way assist, a competitor against the best interests of the Company while in the employ of the Company.

. . .

This agreement is to be construed in accordance with the laws of the Commonwealth of Pennsylvania . . . .

41. At all relevant times, Saint-Gobain owned and lawfully possessed the Confidential Information as defined in the Employment Agreement and has not authorized Ms. MacManus or NewAge Industries to acquire, disclose, or use such information outside of Ms. MacManus's employment obligations to Saint-Gobain.

42. In 2024, Ms. MacManus transferred Saint-Gobain's Confidential Information to her personal Gmail account without authorization, including a document entitled "Customer Contact Information.xlsx." This document constitutes a Saint-Gobain trade secret because it includes detailed lists of customers and their direct contact information. The assembled list took years to create and is not known or readily ascertainable from publicly available information. It is valuable to any entity that wishes to sell high-performance materials, such as fluid transfer tubing,

hose fittings, clamps, and accessories, because it identifies direct and specific industry-wide customer contact information. If accessed or obtained by a competitor, this trade secret could be used to erode Saint-Gobain's competitive advantage and its current and prospective business and customer relationships, among other things.

43.    In approximately February 2025, Ms. MacManus applied for the Strategic Account Executive position at NewAge Industries' AdvantaPure brand, a competitor to Saint-Gobain.

44.    On March 10, 2025, while she was in the process of interviewing for the Strategic Account Executive position at NewAge Industries, Ms. MacManus downloaded from Saint-Gobain's network a file entitled "2025 Jan BPS Standard Product Pricing," which contains Saint-Gobain trade secret pricing information. This document constitutes a Saint-Gobain trade secret because it includes detailed, up-to-date Saint-Gobain pricing, which Saint-Gobain created after years of adjusting product offerings and margins in response to various market forces. Saint-Gobain does not advertise or share with others its pricing information, so the assembled list is not known or readily ascertainable from publicly available information. It is valuable to any entity that wishes to sell performance plastics, such as fluid transfer tubing, hose fittings, clamps, and accessories, because it provides opportunities to undercut Saint-Gobain's pricing structure. If accessed or obtained by a competitor, this trade secret could be used to erode Saint-Gobain's competitive advantage and its current and prospective business and customer relationships, among other things.

45.    That same day, March 10, 2025, Ms. MacManus used her Saint-Gobain issued computer to download approximately 170 additional documents from Saint-Gobain's Salesforce software. These documents contain trade secret, confidential, and proprietary information relating to at least 28 Saint-Gobain customers, including product validation, design drawings, technical

9

information related to product lines, competitive assessments, strategic initiatives, pricing and cost information, customer files, distributor details, quotes, and purchase orders. These documents include trade secret documents relating to Saint-Gobain's C-Flex product line.

46.    These documents constitute Saint-Gobain trade secrets because, individually and cumulatively, they include detailed information about the most crucial aspects of Saint-Gobain's business. These 170 documents, individually and cumulatively, were created over years and are not known or readily ascertainable from publicly available information. They are valuable to any entity that wishes to sell performance plastics, such as fluid transfer tubing, hose fittings, clamps, and accessories, because they provide insight into the products that Saint-Gobain sells, the customers it sells to, the pricing, the cost, and the purchase history. If accessed or obtained by a competitor, this trade secret could be used to erode Saint-Gobain's competitive advantage and its current and prospective business and customer relationships, among other things.

47.    Some of the files provided up-to-date information on Ms. MacManus's sales at Saint-Gobain, including specific part numbers and pricing.

48.    Many of the files that Ms. MacManus downloaded relate to customers that were not in her Saint-Gobain assigned sales territory and, therefore, she had no legitimate Saint-Gobain business reason to download them.

49.    In March 2025, as part of her NewAge Industries employment application, Ms. MacManus presented a slide presentation to NewAge Industries. This presentation included, among other things, a list of Saint-Gobain's confidential distributors as "Distributors to go after." Ms. MacManus did not have permission from Saint-Gobain to share the identities of any of its distributors.

10

50.     On March 31, 2025, Ms. MacManus received a final offer of employment from NewAge Industries, which she accepted. NewAge Industries offered her a higher base salary than what she was making at Saint-Gobain plus a sign-on bonus paid quarterly in three installments up to nine months of employment.

51.     Ms. MacManus' offered role at NewAge Industries involved soliciting customers, including those who do business with Saint-Gobain. Thus she would be well-positioned to use and disclose the information she unlawfully took from Saint-Gobain to promote and benefit NewAge Industries' competing business.

52.     On April 7, 2025, Ms. MacManus resigned from Saint-Gobain. That same day, within a span of less than 10 minutes, Ms. MacManus saved approximately 137 Saint-Gobain files previously downloaded on her Saint-Gobain issued computer to a portable USB Device, by plugging the USB Device into her Saint-Gobain issued computer and dragging and dropping the files onto the USB Device. These files constitute Saint-Gobain's trade secret information, as they contain highly sensitive information, including design drawings, pricing and cost data, quotes, purchase orders, and detailed customer and contact lists.

53.     In addition to the transfer described above, the USB Device also contained other Saint-Gobain files that Ms. MacManus had saved onto it. These files include key customer contact lists, customer purchases and pricing information, presentations relating to business leadership marketing plans, fluid management component product marketing plans,[1] flow control and connectivity product marketing plans, and executive summaries and marketing plans regarding specific Saint-Gobain products, including tubing and hoses. These files also constitute Saint-

---

[1] Saint-Gobain's product marketing plans include highly sensitive information such as sales data, profit margins, positioning, new product activities, and competitive market assessments.

11

Gobain's trade secret information.  Individually and cumulatively, these documents were created over years and are not known or readily ascertainable from publicly available information.  They are valuable to any entity that wishes to sell performance plastics, such as fluid transfer tubing, hose fittings, clamps, and accessories, because they provide insight into the products that Saint-Gobain sells, the customers it sells to, the pricing, the cost, and the purchase history.  If accessed or obtained by a competitor, this trade secret could be used to erode Saint-Gobain's competitive advantage and its current and prospective business and customer relationships, among other things.

54.    The USB Device that Ms. MacManus used was not issued or approved by Saint-Gobain.

55.    Ms. MacManus neither sought permission from nor notified anyone at Saint-Gobain regarding her mass information downloads, exports, and transfers.

56.    Ms. MacManus's last day as an employee at Saint-Gobain was April 9, 2025.

57.    Saint-Gobain agreed to pay Ms. MacManus throughout the rest of her two-week notice period through April 18, 2025.  Ms. MacManus understood that, as a condition of receiving the notice period pay, she was required to return all Saint-Gobain property to Saint-Gobain.

58.    The day before her last day at Saint-Gobain, Saint-Gobain reminded Ms. MacManus of her obligations under the Employment Agreement, and her obligation to inform her new employer of the Employment Agreement and her intent to honor it.  Saint-Gobain also instructed Ms. MacManus not to download or forward via any devices Saint-Gobain property to any personal device or email from her work laptop or company-provided phone.

**D. MacManus and NewAge Industries Work Together To Misappropriate Saint-Gobain Trade Secrets**

59.    On May 27, 2025, while working as an employee at NewAge Industries, Ms. MacManus forwarded the "Customer Contact Information.xlsx" document from her personal

email account to her NewAge Industries email address. Prior to sending this email, Ms. MacManus asked for permission from Michael Czarnowas, NewAge Industries' Global Sales Director, to send herself the customer contact information, which Mr. Czarnowas approved.

60.    Mr. Czarnowas previously worked at Saint-Gobain with Ms. MacManus. Prior to working at NewAge Industries, Ms. MacManus had worked at Saint-Gobain for almost 20 years. Any customer contact information she had in her personal possession could only have come from her work at Saint-Gobain, and Mr. Czarnowas either knew or should have known that.

61.    On June 12, 2025, Ms. MacManus provided her USB Device to NewAge Industries Information Technology employee Joseph Johns, who, at Ms. MacManus's direction, copied approximately 133 Saint-Gobain files from her USB Device to her NewAge Industries business Dell Latitude 5450 laptop computer (the "NewAge Laptop"). On information and belief, these files were also transferred to and located in Ms. MacManus's NewAge Industries OneDrive cloud account, which all employees at NewAge Industries could access.

62.    On information and belief, neither Mr. Johns nor anyone else at NewAge Industries questioned MacManus about the propriety of her request and instruction to transfer the stolen Saint-Gobain files from the USB Device to the NewAge Industries Laptop.

63.    On information and belief, given its years of experience, NewAge Industries knew or should have known that Ms. MacManus unlawfully took and possessed Saint-Gobain Confidential Information and/or trade secret information, and that she was legally bound not to misappropriate such information.

64.    On information and belief, NewAge Industries failed to instruct Ms. MacManus not to unlawfully use any Saint-Gobain Confidential Information and/or trade secret information, and failed to prevent her misappropriation.

13

65.     On information and belief, Ms. MacManus misappropriated Saint-Gobain's Confidential Information and/or trade secret information at the request of and/or at the direction of NewAge Industries employees, including but not limited to Mr. Czarnowas; Joe Donovan, Account Executive; Sonia Schwantes, Market and Technical Development Director; and Paula Martinelli, Product Manager.  These NewAge Industries employees previously worked at Saint-Gobain and, therefore, knew what information Ms. MacManus had access to before she left Saint-Gobain.

66.     Some of the Saint-Gobain files that Ms. MacManus misappropriated include Mr. Czarnowas's name, including:

- "Czarnowas_Feb_22,"
- "Czarnowas_Jul_22,"
- "Czarnowas_Aug_22,"
- "Czarnowas_Jan_23,"
- "Czarnowas_Apr_23," and
- "Czarnowas_May_23."

67.     On information and belief, Ms. MacManus opened Saint-Gobain files on her NewAge Industries Laptop at least 39 times.

68.     On information and belief, Ms. MacManus disclosed customer contact information and/or certain files downloaded from her USB Device to several NewAge Industries employees, including but not limited to Mr. Czarnowas, Mr. Donovan, Ms. Schwantes, and Ms. Martinelli.

69.     On information and belief, these NewAge Industries employees who received such Saint-Gobain trade secret information knew or should have known that the information was (1) Saint-Gobain's trade secret information, and (2) unlawfully obtained and shared.

70.    On information and belief, NewAge Industries knowingly facilitated the unlawful transfer of improperly acquired Saint-Gobain trade secrets to NewAge Industries devices and systems.

71.    On information and belief, NewAge Industries has had improper possession of and access to Saint-Gobain's trade secrets, which it knew or should have known that it acquired through Ms. MacManus's misappropriation, since at least June 2025.

72.    On information and belief, NewAge Industries improperly used Saint-Gobain's trade secrets to further its business objectives.

73.    If this misappropriation by NewAge Industries is not stopped, Saint-Gobain risks the loss of its competitive advantage in the market and its current and prospective customer relationships, among other things.

### E.  Saint-Gobain Confronts Ms. MacManus and NewAge Industries About The Misappropriation

74.    On July 2, 2025, Saint-Gobain sent Ms. MacManus a demand letter, informing her that, based on a forensic investigation of the computer she used while at Saint-Gobain, it appeared that she had breached her obligations to Saint-Gobain and misappropriated Saint-Gobain trade secret information.

75.    That same day, July 2, 2025, Saint-Gobain sent NewAge Industries a letter, informing NewAge Industries of Ms. MacManus's trade secret misappropriation and asking for a prompt response.

76.    On July 11, 2025, counsel for NewAge Industries admitted that Saint-Gobain documents were located on Ms. MacManus's NewAge Industries Laptop.  Counsel for NewAge Industries also admitted that Saint-Gobain documents were uploaded to NewAge Industries' OneDrive cloud account.

77. Ms. MacManus has also admitted that Ms. MacManus misappropriated Saint-Gobain's trade secrets.

78. On August 1, 2025, NewAge Industries terminated Ms. MacManus's employment.

79. The misappropriation described herein, and any additional misappropriation by NewAge Industries that has yet to be revealed, has caused and will continue to cause irreparable damage to Saint-Gobain's competitive advantage and its current and prospective business and customer relationships.

**COUNT I**
**TRADE SECRET MISAPPROPRIATION (DEFEND TRADE SECRETS ACT)**

80. Saint-Gobain incorporates by reference all preceding paragraphs as though fully set forth herein.

81. Saint-Gobain owns, possesses, and maintains protectable trade secret information within the meaning of the DTSA, 18 U.S.C. § 1839(3), as alleged above.

82. These trade secrets, as discussed herein, are not available to the public, and Saint-Gobain closely guards this information and keeps this information strictly confidential to maintain an advantage in its highly competitive business. Saint-Gobain takes reasonable measures to keep this information secret.

83. Saint-Gobain's trade secret information, as discussed herein, derives independent economic value from not being generally known to the public and not being readily ascertainable through proper means by anyone who could obtain economic value from the disclosure or use of the information.

84. Saint-Gobain's trade secret information, as discussed herein, is related to Saint-Gobain's products and/or services intended for use in, and used in, interstate and foreign commerce.

85.   Access to and/or possession of such trade secret information would provide a competitor with a substantial and unfair advantage in pricing, sales strategy, customer acquisition, product design and development, operational execution, and market expansion, to the detriment of Saint-Gobain.

86.   NewAge Industries misappropriated Saint-Gobain's trade secrets, as discussed herein, in the unlawful manner alleged herein by acquiring, using, and/or disclosing Saint-Gobain's trade secrets.

87.   In particular, Ms. MacManus acquired Saint-Gobain's trade secrets by improper means through her various downloads, exports, and transfers of confidential files, then used and disclosed those trade secrets, without Saint-Gobain's knowledge or permission, to develop sales and marketing strategies and acquire new customers and business opportunities for NewAge Industries, among other things.  On information and belief, NewAge Industries thereby unlawfully obtained and is using and/or in possession of Saint-Gobain's trade secrets for product development, sales, and marketing activities.

88.   On information and belief, NewAge Industries knew or should have known that the possession and/or disclosure of Saint-Gobain's Confidential Information by Ms. MacManus was achieved through improper means.

89.   On information and belief, NewAge Industries knowingly and unlawfully transferred Saint-Gobain's trade secrets, which Ms. MacManus misappropriated, onto NewAge Industries systems and devices for use and access by NewAge Industries employees.

90.   On information and belief, NewAge Industries employees directed and/or approved Ms. MacManus' misappropriation of Saint-Gobain's information.

91.    On information and belief, NewAge Industries employees knowingly and unlawfully acquired Saint-Gobain trade secrets through Ms. MacManus's misappropriation.

92.    NewAge Industries' conduct constitutes misappropriation within the meaning of 18 U.S.C. § 1839(5), including but not limited to: (a) the acquisition of trade secrets by persons who knew or had reason to know that such information was acquired by improper means; and/or (b) the disclosure or use of such trade secrets without consent, when NewAge Industries knew or had reason to know that the information was improperly acquired and/or unlawfully disclosed.

93.    Based on the facts recited herein, NewAge Industries' knowing misappropriation of Saint-Gobain's trade secret information was intentional, willful, fraudulent, and oppressive.

94.    NewAge Industries knew that its actions were unauthorized because it knew that Saint-Gobain's trade secrets, discussed herein, were secret and that Saint-Gobain would be harmed if those trade secrets were shared with any competitors.

95.    On information and belief, NewAge Industries used Saint-Gobain's trade secrets to enhance NewAge Industries' product and customer portfolios and compete directly with Saint-Gobain, thereby causing irreparable harm to Saint-Gobain.  If NewAge Industries is not enjoined, it will continue to use Saint-Gobain's trade secrets to compete with Saint-Gobain.  NewAge Industries' conduct therefore represents a continuing threat for which Saint-Gobain has no adequate remedy at law.  Unless and until enjoined and restrained by order of this Court, NewAge Industries will continue to retain and use Saint-Gobain's trade secrets, and Saint-Gobain will continue to suffer severe and irreparable damage as a result.  The DTSA, 18 U.S.C. § 1836(b)(3), therefore entitles Saint-Gobain to an injunction.

96.    Saint-Gobain is also entitled to recover damages from NewAge Industries for its misappropriation of Saint-Gobain's trade secrets, including exemplary damages for willful

18

misappropriation.  18 U.S.C. § 1836(b)(3).  The amount of such damages cannot be determined at this time but will be proven at trial.  Saint-Gobain is further entitled to recover any gains, profits, advantages, and unjust enrichment that NewAge Industries has obtained as a result of the misappropriation alleged herein (e.g., avoided marketing, sales, and research and development costs).  Saint-Gobain is currently unable to ascertain the full extent of these gains, profits, and advantages but will prove the value thereof at trial.  Saint-Gobain is further entitled to a reasonable royalty in an amount to be proved at trial.

### COUNT II
### TRADE SECRET MISAPPROPRIATION (PENNSYLVANIA UNIFORM TRADE SECRETS ACT)

97.    Saint-Gobain incorporates by reference all preceding paragraphs as though fully set forth herein.

98.    Saint-Gobain owns, possesses, and maintains protectable trade secret information within the meaning of the PUTSA, 12 Pa. C.S. § 5302, as alleged above.

99.    These trade secrets, as discussed herein, are not available to the public, and Saint-Gobain closely guards this information and keeps this information strictly confidential to maintain an advantage in its highly competitive business.  Saint-Gobain takes reasonable measures to keep this information secret.

100.    Saint-Gobain's trade secret information, as discussed herein, derives independent economic value from not being generally known to the public and not being readily ascertainable through proper means by anyone who could obtain economic value from the disclosure or use of the information.

101.    Access to and/or possession of such trade secret information would provide a competitor with a substantial and unfair advantage in pricing, sales strategy, customer acquisition,

19

product design and development, operational execution, and market expansion, to the detriment of Saint-Gobain.

102. NewAge Industries misappropriated Saint-Gobain's trade secrets, as discussed herein, in the unlawful manner alleged herein by acquiring, using, and/or disclosing Saint-Gobain's trade secrets.

103. In particular, Ms. MacManus acquired Saint-Gobain's trade secrets by improper means through her various downloads, exports, and transfers of confidential files, then used and disclosed those trade secrets without Saint-Gobain's knowledge or permission to develop sales and marketing strategies and acquire new customers and business opportunities for NewAge Industries. On information and belief, NewAge Industries unlawfully obtained and is using and/or in possession of Saint-Gobain's trade secrets for product development, sales, and marketing activities.

104. On information and belief, NewAge Industries knew or should have known that the possession and/or disclosure of Saint-Gobain's Confidential Information by Ms. MacManus was through improper means.

105. On information and belief, NewAge Industries knowingly and unlawfully transferred Saint-Gobain's trade secrets, which Ms. MacManus misappropriated, onto NewAge Industries systems and devices for use and access by NewAge Industries employees.

106. On information and belief, NewAge Industries employees directed and/or approved Ms. MacManus' misappropriation of Saint-Gobain's information.

107. On information and belief, NewAge Industries employees knowingly and unlawfully acquired Saint-Gobain trade secrets through Ms. MacManus's misappropriation.

108.    NewAge Industries' conduct constitutes misappropriation within the meaning of 12 Pa. C.S. § 5302, including but not limited to: (a) acquisition of trade secrets by persons who knew or had reason to know that the trade secrets were acquired by improper means; and (b) disclosure or use of trade secrets without consent by a party who knew or had reason to know that the trade secrets were improperly acquired and/or unlawfully disclosed.

109.    Based on the facts recited herein, NewAge Industries' knowing misappropriation of Saint-Gobain's trade secret information was intentional, willful, malicious, fraudulent, and oppressive.

110.    NewAge Industries knew that its actions were unauthorized because it knew that Saint-Gobain's trade secrets, discussed herein, were secret and that Saint-Gobain would be harmed if those trade secrets were shared with any competitors.

111.    On information and belief, NewAge Industries used Saint-Gobain's trade secrets to enhance NewAge Industries' product and customer portfolios and compete directly with Saint-Gobain, thereby causing irreparable harm to Saint-Gobain.  If NewAge Industries are not enjoined, it will continue to use Saint-Gobain's trade secrets to compete with Saint-Gobain.  NewAge Industries' conduct therefore represents a continuing threat for which Saint-Gobain has no adequate remedy at law.  Unless and until enjoined and restrained by order of this Court, NewAge Industries will continue to retain and use Saint-Gobain's trade secrets, and Saint-Gobain will continue to suffer severe and irreparable damage as a result.  The PUTSA, 12 Pa. C.S. § 5303, therefore entitles Saint-Gobain to an injunction.

112.    Saint-Gobain is also entitled to recover damages from NewAge Industries for its misappropriation of Saint-Gobain's trade secrets, including exemplary damages for willful misappropriation.  12 Pa. C.S. § 5304.  The amount of such damages cannot be determined at this

time but will be proven at trial. Saint-Gobain is further entitled to recover any gains, profits, advantages, and unjust enrichment that NewAge Industries have obtained as a result of the misappropriation alleged herein (e.g., avoided marketing, sales, and research and development costs). Saint-Gobain is currently unable to ascertain the full extent of these gains, profits, and advantages but will prove the value thereof at trial. Saint-Gobain is further entitled to a reasonable royalty in an amount to be proved at trial.

## JURY DEMAND

113. Saint-Gobain demands a jury trial as to all issues that are triable by a jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, Saint-Gobain respectfully requests that the Court enter judgment in favor of Saint-Gobain and against NewAge Industries, as follows:

A. For Judgment in Saint-Gobain's favor against NewAge Industries on all causes of action alleged herein;

B. A finding that Saint-Gobain's trade secrets continue to be misappropriated;

C. A finding that NewAge Industries' misappropriation of trade secrets is willful and therefore should result in an award of exemplary and enhanced damages;

D. For compensatory and consequential damages in an amount to be proven at trial;

E. For a reasonable royalty in an amount to be proven at trial;

F. For restitution and disgorgement of NewAge Industries' unjust enrichment or ill-begotten profits;

G. For costs of suit incurred;

H. For pre-judgment interest;

I. For post-judgment interest;

22

J.  For injunctive relief;

K.  For attorney's fees and costs;

L.  For such other and further relief as the Court may deem to be just and proper.

Dated: April 20, 2026

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

*/s/ Julie S. Goldemberg*
Julie S. Goldemberg (PA Bar No. 314339)
Amy M. Dudash (PA Bar No. 311898)
Anna F. Johnson (PA Bar No. 332031)
2222 Market Street
Philadelphia, PA 19103-3007
Telephone: (215) 963-5000
Facsimile: (215) 963-5001
julie.goldemberg@morganlewis.com
amy.dudash@morganlewis.com
anna.johnson@morganlewis.com

*Attorneys for Plaintiff*

23